UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ODESSA BABBITT,<br><br>                Plaintiff,<br><br>      v.<br><br>PRI XVII, L.P. d/b/a<br>THE WESTIN PROVIDENCE,<br><br>                Defendant. | C.A. No. 07-274 S |

## OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Odessa Babbitt ("Plaintiff" or "Babbitt") filed a Complaint against Defendant PRI XVII, L.P. d/b/a The Westin Providence ("Defendant" or "the Westin") alleging that during her employment with the Westin she was sexually harassed by co-workers and she was fired when she complained about the harassment to her supervisor. Before the Court is Defendant's Motion for Summary Judgment. The gist of Defendant's argument is that Plaintiff cannot establish a prima facie case of discrimination or retaliation because the conduct alleged was not severe or pervasive, Plaintiff's termination was based strictly on her poor job performance, and Plaintiff has failed to set forth any facts upon which a jury could rely to find the proffered reasons to be pretextual.

After careful consideration, the Court concludes that while the call is arguably close, genuine issues of material fact remain and summary judgment is, therefore, not appropriate.

I.   Background

The Court reviews the record in the light most favorable to the non-moving party, making all reasonable inferences in her favor. Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008).

Defendant operates the Westin Hotel located in downtown Providence, Rhode Island. The Westin hires new housekeeping and room service employees on a ninety-day probationary basis, in accordance with its collective bargaining agreement with the union that represents the housekeeping and room service employees. All probationary employees are at-will and may be terminated for any lawful reason. Defendant's practice is to terminate probationary employees who perform marginally before the probationary period expires, in order to avoid the termination procedures contained in the collective bargaining agreement.

Plaintiff was employed by Defendant as a room service attendant from June 11, 2006, to September 8, 2006.[1] She worked three days a week (Friday through Sunday), for a total of 24 hours

---

[1] Plaintiff was employed by Defendant as a housekeeping attendant in October 2005; however, she was discharged less than ninety days after being hired for performance reasons. Plaintiff reapplied for employment at the Westin on April 25, 2006.

per week.  In July 2006, Plaintiff was involved in three documented disciplinary incidents.  In particular, two instances involved tardiness and one instance involved failing to bring a spoon to a guest's room as instructed by her manager.  During the following six weeks of her employment, Plaintiff received no additional documented performance deficiencies.

Plaintiff alleges that throughout her employment she was subjected to severe and pervasive incidents of sexual harassment perpetrated by her male co-workers.  In his affidavit, Gregorio Rodriguez, the co-worker who conducted Babbitt's initial training as a room service attendant, states that employees made sexual comments about Babbitt and comments about Babbitt's beauty on a "constant daily basis."  (See Rodriguez Aff. 1, Apr. 23, 2009.)  In Plaintiff's own words, incidents of harassment (verbal and nonverbal) occurred "all the time."  (See Babbitt Dep. 92, 93, July 1, 2008.)

Specifically, Plaintiff contends that male employees would whistle and make noises at her, stare at her body, and make sexually-charged comments about her body such as: "look at that, umm" and "check out the new girl."[2]  (See Babbitt Dep. 94:6-7, 97:15-16.)  Comments were directed at Plaintiff when she was the only female present, and comments made out of her presence were

_____

[2] Plaintiff also related one incident when she was running to catch an elevator and yelled "I'm coming" to which a male employee crassly exclaimed that "I'm coming too."

often communicated back to her, at a later time, by other employees. Plaintiff also alleges that she regularly heard such comments made in Spanish; and although Plaintiff does not speak Spanish, she alleges that comments were said in such a way that she could understand the basic context - namely, that these were sexually charged comments about her. Rodriguez stated employees would regularly make sexual comments to him about Babbitt, which he would then relay to Plaintiff, acting as her translator. On one occasion, when a comment was made in Spanish in the elevator that Rodriguez and Babbitt rode in, Rodriguez told her that the employee said he wanted "to f*** her a**." (See Rodriguez Aff. 2.)

Plaintiff also claims she endured nonverbal forms of sexual harassment, as male co-workers would gawk and stare at her in a suggestive manner that made her uncomfortable. Male co-workers would arrive and linger around Plaintiff's work area for the sole purpose of staring at her. Two of Plaintiff's co-workers, George Cook and Gregorio Rodriguez, witnessed this behavior. At some point Plaintiff states that she no longer felt safe riding in the elevator alone and she would request that others accompany her on any trips.

According to Plaintiff, on at least one occasion, a lewd comment was directed at her in the presence of her supervisor, Regina Hole. Rather than taking disciplinary action, Hole simply rolled her eyes and walked away. Rodriguez also stated in his

affidavit that Hole was "frequently present when off color or sexually oriented behavior occurred in the kitchen/room service areas, but never took any corrective action." (See Rodriguez Aff. 2.)

Plaintiff refrained from reporting the harassment because of her belief that she would be fired immediately if she complained during her probationary period. Plaintiff developed this belief after she was informed by a Human Resources manager that until she was in the Union, she could be fired for any reason. Rodriguez also confirmed this "unwritten rule" and advised the Plaintiff not to complain about anything or she would be fired. (See Rodriguez Aff. 3.)

Unbeknownst to Plaintiff, Hole was wrestling with the decision to fire her as the end of the ninety-day probationary period approached. Hole discussed her intention to terminate the Plaintiff with the Westin's Director of Human Resources, Troy Goodman, and another of Plaintiff's supervisors, Abigail McLaren. According to Hole, on September 7, 2006, she told Goodman of her intent to terminate the Plaintiff the following day. They completed the required termination paperwork citing Plaintiff's "tardiness and poor job performance." (See Associate Corrective Communication Notice, Sept. 8, 2006.) The following morning, which was exactly ninety days after Babbitt began working at the Westin,

5

sometime before 9:00 a.m., Hole asked Mirjaam Herrand, the union shop steward, to serve as a witness to the termination meeting.

Shortly after arriving for her shift on September 8th at approximately 6:00 a.m., Plaintiff confronted co-worker Marcus Villa for allegedly spreading a rumor that Babbitt wanted to have a sexual relationship with another co-worker because he had a large penis. Plaintiff states that Villa previously had spread the same rumor about another co-worker. A heated exchange took place in the kitchen in an argument between Villa and Babbitt that was witnessed by several employees. Plaintiff maintains that at approximately 11:00 a.m. she spoke with Hole in her office where she complained about sexual harassment. Hole denies this conversation occurred. However, according to Villa in a statement made after the confrontation, Hole witnessed the incident between Villa and Babbitt, Plaintiff immediately complained about Villa to Hole, and Villa was taken aside by Hole. (See HR Interview with Marcus Villa, Nov. 16, 2006.)

At approximately 2:00 p.m. on the same day, Plaintiff met with Hole and Herrand and was told she was being terminated. Upon learning of her discharge, Plaintiff yelled "I don't care" and abruptly left Hole's office. (See Hole Aff. ¶ 12, Feb. 19, 2009.) Plaintiff contends that at some point during the meeting Hole said "we have to . . . let you go. We can't have like this harassment stuff going on here." (See Babbitt Dep. 123-124.) Hole disputes

6

this statement, contends that at no time did Plaintiff mention that she had been harassed and that the termination was strictly based on Plaintiff's poor job performance.  Plaintiff refused to sign her termination paperwork and the meeting ended.

Plaintiff claims that she suffers from anxiety, dizziness, and nightmares and has been diagnosed with Post Traumatic Stress Disorder and Panic Disorder.  Furthermore, Plaintiff's primary care physician stated that Plaintiff's "physical symptoms are causally related to the workplace incidents of sexual harassment."  (See Letter of Meghan E. Gange, MD, Nov. 27, 2006.)

On or about November 22, 2006, Plaintiff filed a petition with the Rhode Island Commission for Human Rights alleging that she had been terminated in retaliation for reporting sexual harassment. The Commission issued her a right to sue letter on June 12, 2007. She filed her Complaint with this Court on July 20, 2007.

II.   Standard of Review

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997), and it is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets."  Roche v. John Hancock Mut. Life Ins.

Co., 81 F.3d 249, 253 (1st Cir. 1996). As noted above, the Court views the record in the light most favorable to the Plaintiff, and must draw all reasonable inferences in her favor. See Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004). Plaintiff bears the burden of proof at this stage, and the "evidence adduced on each of the elements of [her] asserted cause of action must be significantly probative in order to forestall summary judgment." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007).

III. Discussion

Plaintiff's Complaint alleges four counts: Count I for violation of Title VII for hostile work environment and retaliation, Count II for violation of the Rhode Island Fair Employment Practices Act ("FEPA") for hostile work environment and retaliation, Count III for violation of Rhode Island Civil Rights Act ("RICRA") for hostile work environment and retaliation, and Count IV for violation of the Rhode Island Whistleblower Protection Act ("WPA"). While each count is independent, Plaintiff's case has two main themes: sexual harassment hostile work environment and retaliatory discharge. The Court will therefore analyze both the federal and state actions together. See Rathbun v. Autozone, Inc., 253 F. Supp. 2d 226, 234, 236 (D.R.I. 2003), aff'd, 361 F.3d 62, 71 (1st Cir. 2004) (noting that the Rhode Island Supreme Court routinely analyzes FEPA claims under Title VII and that FEPA and RICRA claims rise and fall together).

A.    Hearsay[3]

As a threshold matter, Defendant argues that Plaintiff's testimony, with respect to co-workers statements that she heard through third parties, is inadmissable hearsay and cannot be considered by the Court.   In particular, Defendant objects to Babbitt's deposition testimony that she was told by Rodriguez what the gentlemen in the elevator said to him in Spanish, and that she was also told that co-workers were coming to her work area to stare at her.  Defendant argues that this is hearsay and double hearsay. Defendant concedes, however, that with respect to the first layer of hearsay, "the Cook and Rodriguez affidavits relieve Plaintiff of the hearsay issue regarding comments relayed by those individuals." (See Def's. Reply 4-5.)

The second layer, i.e. the statements made by other employees to Cook and Rodriguez, also do not present a hearsay problem. These statements may only be construed as inadmissable hearsay if they were offered to prove the truth of what the co-workers were saying, for example that the male employees wanted to have sexual intercourse with Babbitt.   However, these statements are not hearsay and are admissible because they are not offered to prove

---

[3] The Court only addresses Defendants hearsay argument for statements made by Plaintiff to the extent the Court actually relies upon the information at the summary judgment stage.   The Court expresses no views on the admissibility of any other specific statements that may arise during trial and reserves its judgment on those statements until that time.

the truth of what was asserted; rather, the statements are introduced in order to show they were made, and to demonstrate the work environment that the Plaintiff was operating in.   To be precise, the statement of the co-worker in the elevator that he wanted to have sex with Plaintiff is not proffered to show he actually has that desire.   It is offered to show that a sexual and highly offensive remark, directed at the Plaintiff, was made by a co-worker to another co-worker and relayed to the Plaintiff.

These statements confirm Plaintiff's experience, and her belief that sexually offensive statements were being made. Further, the statements offer an explanation for Plaintiff's changed behavior at work, for example, why she would not take the elevator alone, even though as a room service employee it was part of her position to make "sweeps" on a regular basis.

For these reasons, the Court holds that the hearsay objection does not preclude the Court from considering the statements at this juncture.

B.   Hostile Work Environment

Plaintiff's claims of sexual harassment are based on incidents involving her co-workers.   In order to prevail on a theory of co-worker harassment, Plaintiff must prove: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter

10

the conditions of her employment and create an abusive work environment; (5) that the objectionable conduct was both objectively and subjectively offensive; and (6) that some basis for employer liability has been established. Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 189 (1st Cir. 2003). Defendant argues that it is entitled to summary judgment because even with all inferences drawn in favor of Plaintiff, she cannot establish the elements of this claim.

> 1. Severe or Pervasive

Defendant argues that Babbitt is unable to establish that any harassment she allegedly faced was severe or pervasive enough to be actionable. In determining whether Plaintiff's burden is met factors such as frequency; severity; tone (i.e. threatening, humiliating or a mere offensive utterance); and the effect on work performance should be considered. O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001). "Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." Id. "The accumulated effect of incidents of humiliating, offensive comments directed at women and work-sabotaging pranks, taken together, can constitute a hostile work environment." Id.; Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993) ("[c]ertainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being").

Here, Babbitt offered evidence that while not overwhelming, could prove that her male co-workers made frequent and vulgar comments about her body; that such comments were made directly to her, to other employees while in her presence, and some were repeated enough times to be reported second-hand to her. (Defendant characterizes some of these comments as merely juvenile banter, but they could be perceived as much more.)  Plaintiff offered evidence that male co-workers would openly stare and gawk at her, and that men would come to her work area for no other reason than to do so.  Although her co-workers often spoke in Spanish, Plaintiff states that she could gauge from the sounds and gestures the sexual content of the conversations and that the men were referring to her, resulting in fear and humiliation. Plaintiff's evidence, if believed by the jury, supports a conclusion that the conduct started from the onset of her employment and continued until the day she was fired (thus, pervasive).  Plaintiff further testified that as a result of this treatment she avoided taking the elevator alone out of fear of her co-workers.  Finally, Plaintiff buttresses her claim with evidence that two doctors have diagnosed her with post traumatic stress disorder and have stated that there may be a causal relationship to the harassment she faced while employed by the Westin.[4]  See

---

[4] By referring to this evidence at this stage the Court is not implying that it will ultimately be admissible if challenged pursuant to a Daubert motion.

12

<u>Billings v. Town of Grafton</u>, 515 F.3d 39, 50 (1st Cir. 2008) ("the hostile environment question is commonly one of degree -- both as to severity and pervasiveness -- to be resolved by the trier of fact on the basis of inferences drawn from a broad array of circumstantial and often conflicting evidence").

Defendant argues that summary judgment is appropriate because all of the above amounts, at best, to isolated instances of "intersexual flirtation" and only co-workers, not Babbitt's supervisors, were involved. While Defendant correctly states that a single incident is insufficient to establish the severe and pervasive element, Plaintiff has put forth evidence of substantially more than one incident. Over the course of Plaintiff's relatively brief employment with Defendant, right up until its dramatic ending, the number of incidents, if proved, and the effect of those incidents upon Plaintiff, could be enough to allow a jury to find that this is not a case of mere flirtation. While the evidence is no slam-dunk, it is enough to raise a genuine factual issue for the jury as to whether the severity and pervasiveness element is met. Thus, construing the facts in the light most favorable to Babbitt, summary judgment is inappropriate on this basis.

    2.    Employer Liability: Knew or Should Have Known

Defendant argues summary judgment is also warranted because Babbitt never complained to her employer, and her employer had no

reason to know of the harassment.  "Ordinarily, where sexual harassment is by a non-supervisory co-worker, the employer is liable only if the plaintiff can demonstrate that the employer was negligent, i.e., that it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action.'"  Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32 n.1 (1st Cir. 2003) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002)).

Plaintiff has put forth sufficient evidence to demonstrate that a material factual dispute exists regarding Defendant's actual and/or constructive knowledge of the harassment.  To begin, Plaintiff testified that she told Hole about the sexual harassment on the day she was fired, a fact which Hole disputes.  In addition, Plaintiff testified that her supervisor had witnessed some of the ongoing harassment antics, and simply "rolled her eyes."  Although Plaintiff agrees that she did not report the harassment earlier than the day she was fired, it is undisputed that she had been told by other co-workers that she was not to complain about anything during the ninety-day probationary period or she would be fired, and that the Human Resources Department at the Westin impliedly conveyed a similar warning to her.

On these facts it cannot be said with certainty that Plaintiff's "ordinary fear or embarrassment" prevented her from reporting the conduct earlier.  Rather, Babbitt has provided enough

evidence to raise a question as to whether the Defendant acted reasonably to prevent the harassing behavior.  See Smith v. First Union Nat'l Bank, 202 F.3d 234, 245 (4th Cir. 2000) (court held if employee is discouraged from using complaint process it cannot be said that employer exercised reasonable care to prevent the harassment); see also Reed, 333 F.3d at 35 (employee must have concrete reason for not reporting and more than ordinary fear or embarrassment is needed).  This too is a close call, but Plaintiff has put forward enough to clear the summary judgment bar, if only by a slim margin.

C.   Retaliation and the Whistleblower Protection Act

For a retaliation claim "to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory."  King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997).  The Court analyzes the Title VII retaliation claim under the McDonnell Douglas framework.  Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 84 (1st Cir. 2005) (describing modified analysis for retaliation claims drawn from McDonnell Douglas).  The prima facie elements are that (1) plaintiff engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the action is causally connected to the protected conduct.  Id.; Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004).  Similarly, an employee

claiming she was fired as a result of reporting a violation under the WPA must also demonstrate a causal connection between her report and her termination. See Marques v. Fitzgerald, 99 F.3d 1, 6 (1st Cir. 1996) (jury must determine whether plaintiff was actually fired as a result of his statements). Defendant argues there is insufficient evidence of this causal link.

A Court can dispense with the McDonnell Douglas framework when a plaintiff comes forward with direct evidence of retaliation. DeCaire v. Mukasey, 530 F.3d 1, 20 (1st Cir. 2008). Direct evidence of retaliation normally consists of "those statements by a decision maker that directly reflect the alleged animus and bear squarely on the contested employment action." Id. at 17 (internal quotations and citation omitted). "Comments which, fairly read, demonstrate that a decision-maker made, or intended to make, employment decisions based on forbidden criteria constitute direct evidence of discrimination." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 61 (1st Cir. 2000).

Here, direct evidence of retaliation is arguably present. While Defendant contends the decision to terminate had been made prior to the termination meeting, Plaintiff has testified that during the termination meeting Hole stated words to the effect: "we have to . . . let you go. We can't have like this harassment stuff going on here. . . . [W]e can't have all this stuff going on, this harassing thing; Marcus, you and this whole thing is

16

ridiculous."    (See Babbitt Dep. 123:24-124:4.)    This evidence, while disputed, at least suggests that the "harassment" played a role in Hole's decision to fire Babbitt.  Defendant argues that a retaliatory animus could not have motivated Hole because she decided to terminate Plaintiff on September 7th, when she and Goodman filled out the termination paperwork, one day before Plaintiff allegedly complained.  But even if true, it is not clear from this fact alone that Hole was not acting on September 7th on the same thoughts and conclusions she purportedly expressed on the 8th, whether she expressed that to Goodman or not.

With respect to Defendant's causation argument, the timing of the events in this case are much too close for the Court's comfort on summary judgment.   See Calero-Cerezo, 355 F.3d at 25-26 (the closer in time an adverse action is to a protected complaint, the greater the inference of causation); see also Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988).   Moreover, Hole's assertion that she and Goodman prepared the termination paperwork on September 7th is contradicted by an indication on the form that it was prepared on September 8, 2006.   (See Associate Corrective Communication Notice.)   During his deposition (at least in the sections provided to the Court), Goodman made no mention of helping Hole to complete the paperwork on the 7th.   Rather, Goodman had communicated to Hole "about a week before, . . . that if you were going to let Odessa go, it's probably best to do it before the 90

days, as far away from the 90 days as possible." (See Goodman Dep. 16:10-14, Nov. 24, 2008.) Goodman also stated that he could not recall another situation in which Defendant waited until the last day of the probationary period to terminate an employee. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000). (stating evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" can support finding pretext).

In short, even without Plaintiff's direct evidence, the temporal proximity between the key events, the inconsistences in Hole's testimony, and the fact that the Defendant generally attempts to terminate marginally performing employees well in advance of the end of their probationary period (not on the last day of it) raise too many factual questions that must be resolved by a jury to allow for summary judgment.

IV.   Conclusion

While Plaintiff's case may rest on some fairly thin reeds, she has demonstrated sufficient factual questions to require a trial. Whether her allegations can stand up to the closer scrutiny of Rule

50 of the Federal Rules of Civil Procedure and/or to the rigors of trial, will remain to be seen.   For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.

_____
William E. Smith
United States District Judge
Date:   10/26/09